UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DON JACKSON,

                Petitioner,              Case No. 2:13-cv-11960

v.                              Honorable Patrick J. Duggan

MARY BERGHUIS,

                Respondent.

_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF
HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY,
AND GRANTING PERMISSION TO PROCEED ON APPEAL *IN FORMA
PAUPERIS***

Petitioner Don Jackson, a Michigan Department of Corrections prisoner

currently confined at the Kinross Correctional Facility in Kincheloe, Michigan, filed

a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on May 1,

2013.[1]  On December 16, 2010, following a bench trial in the Wayne County Circuit

_____

[1] According to this Court's docket, as well as the Michigan Department of
Corrections' Offender Tracking Information System ("OTIS"), Petitioner is housed
at Kinross Correctional Facility, where Duncan MacLaren is the warden.  The proper
respondent in a habeas case is the habeas petitioner's custodian, which in the case of
an incarcerated habeas petitioner is the warden.  *Peyton v. Rowe*, 391 U.S. 54, 58, 88
S. Ct. 1549, 1151 (1968) ("The writ of habeas corpus . . . assures . . . that a prisoner
may require his jailer to justify the detention under law."); *Edwards v. Johns,* 450 F.
Supp. 2d 755, 757 (E.D. Mich. 2006); *see also* Rule 2(a), Rules Governing Section
2254 Cases, 28 U.S.C. foll. § 2254.  Thus, Warden MacLaren, not Mary Berghuis, is
the proper respondent in this action, and the Clerk of the Court shall amend the
caption to reflect as much.

Court, Petitioner was convicted of first-degree home invasion and felonious assault, in violation of Michigan Compiled Laws §§ 750.110a(2) and 750.82. Subsequent to the adjudication of guilt, Petitioner was sentenced as a fourth-habitual offender, Michigan Compiled Laws § 769.12, to concurrent terms of eight years and five months to twenty years for the home-invasion conviction, and eight years and five months to fifteen years for the felonious-assault conviction. Petitioner's convictions and sentences were affirmed on direct appeal.

In the present habeas application, Petitioner challenges his convictions and his sentences, specifically raising the following claims: (1) there was insufficient evidence for the trial judge to find Petitioner guilty, beyond a reasonable doubt, of the crimes of which he was convicted; (2) Petitioner's trial counsel was ineffective for failing to investigate and call various witnesses at trial; and (3) the trial court improperly sentenced him to a term of incarceration exceeding the state's sentencing guidelines. Having thoroughly reviewed the claims asserted in the habeas application, the accompanying briefs, and the Rule 5 materials,[2] the Court concludes that Petitioner is not entitled to the issuance of the writ. Therefore, the Court will deny Petitioner's application. The Court will also deny Petitioner a certificate of appealability.

---

[2] Rule 5 of the Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254, specifically subdivisions (c) and (d), set forth the respondent's obligation to submit state court materials related to the conviction and appeal challenged in a § 2254 proceeding.

2

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The criminal charges against Petitioner arose out of an incident at Sarah Tompkins's residence in Ecorse, Michigan on June 21, 2010.  Four witnesses testified during the one-day bench trial: Tompkins (the victim), two police officers, and Petitioner.  The trial judge's findings of fact, while entitled to a presumption of correctness on habeas review, 28 U.S.C. § 2254(e)(1), require some elucidation, as the factual findings stated on the record are short on details.  To provide a more complete sense of what transpired, the Court turns to the trial testimony.

According to Tompkins, she and Petitioner were romantically involved when she was thirteen-years-old.  (12/16/10 Trial Tr. 12-13, ECF No. 10-3.)  Some thirty years later, around the time of her mother's funeral, she was reunited with Petitioner. (7/1/10 Prelim. Exam Tr. 5, ECF No. 10-2 (stating that she was forty-three at the time of the preliminary examination).)  Tompkins testified that she had few interactions with Petitioner around this time.  (*See, e.g.*, 12/16/10 Trial Tr. 23.)  On one occasion, Petitioner expressed an interest in rekindling their relationship, but Tompkins was not receptive.  (12/16/10 Trial Tr. 25.)

Tompkins testified that on the date of the incident, she was removing garbage from her home to place on the curb for pickup when she noticed Petitioner arrive in a red Cadillac.  (*Id.* at 14, 31-32.)  Although Tompkins's testimony equivocated on the issue of whether Petitioner or a female was driving, she testified that Petitioner

3

exited the vehicle and ran towards her in a threatening manner, prompting her to seek safety inside of her home.  (*Id.* at 32-34.)  At some point while trying to get back inside, Tompkins instructed her neighbor – whom she knew only as "Auntie" – to go inside because Petitioner had started arguing with her.  (*Id.* at 30-31.)   Once inside of her home, Tompkins attempted to close and lock the door, but Petitioner forced his way inside.  (*Id.* at 34-35.)  The two began "tussling" on the floor of a landing, next to the stairwell leading to the basement.  (*Id.* at 35.)  Tompkins's cordless telephone was also on the landing, which Petitioner used to strike Tompkins in the right eye, before berating her, and striking her once more with the telephone near her eye.[3]  (*Id.* at 19-21.)  After she had been hit a second time, the telephone, which was still in Petitioner's hand, rang.  "I told him if he don't let me answer the phone, someone is gon' come over.  At that time he gave me the phone.  It was my auntie."  (*Id.* at 21.)   Petitioner went down to the basement while Tompkins spoke with her aunt, and Tompkins was able ask tell her aunt to call the police, which she did.  (*Id.*)  The police arrived shortly thereafter and arrested Petitioner.  (*Id.* at 68.)

---

[3] During the preliminary examination, Tompkins testified that Petitioner first hit her in the mouth, then near her right eye.  (7/1/10 Prelim. Exam Tr. 9.)  She further testified that she had a black eye and was bleeding from her lip.  (*Id.*)  Petitioner's trial counsel impeached Tompkins during trial with these statements.  (12/16/10 Trial Tr. 40-41.)  Adding to the inconsistency, the responding police officer testified at trial that when he arrived, Plaintiff appeared scared, was shaking, her right eye was swollen, and that she had a small cut on her lip.  (*Id.* at 66-67.)

4

Petitioner recounted a very different version of what occurred at Tompkins's house.  According to him, he and Tompkins had rekindled their romance; he helped her around the house, provided her with funds to purchase household necessities, and periodically spent the night.[4]  (*Id.* at 83.)  Petitioner testified that he was with Tompkins earlier on June 21, 2010,[5]  and acknowledged returning that evening with a woman named "Jackie," who he described as a nearly seventy-year-old lady he had picked up from the store to drive her home.  (*Id.* at 88, 103.)  He decided to stop by Tompkins's house to see if she needed anything while he was out, and, after sitting in the driveway with Jackie for a period of time, saw Tompkins emerge from her residence to place items on the curb for garbage collection.  (*Id.* at 89-90.)  Tompkins asked for Petitioner's assistance, which he provided, and while carrying some items outside, Tompkins's neighbor was in his way and he "cussed her neighbor for being in the way."  (*Id.* at 91.)

---

[4] In her findings of fact, the trial judge appears to have credited this testimony, stating: ". . . [H]e claims after [the two ran into each other after several decades], he spent nights at her house, cooked food, laid around the house.  She never denied it." (12/16/10 Trial Tr. 117-18.)   Tompkins did deny that Petitioner had stayed there "on a number of occasions[,]" but did not testify that it never occurred.  (*Id.* at 24.)

[5] Tompkins was impeached on cross-examination on the issue of whether Petitioner had been at her house earlier on the day of the incident.  During the preliminary examination, Tompkins testified that Petitioner arrived at her house with "some crack head in a car with him and . . . went off on Nathan [Abrams, her mother's boyfriend].  He told me [Nathan] can't be there, and I told him get up off my porch[.]"  (7/1/10 Prelim. Exam Tr. 12.)

5

Petitioner, who was not under the impression that he was unwelcome in the house, went back inside to see if Tompkins needed anything else.  (*Id.* at 90-91.) Once inside, Tompkins's phone rang, and she answered.  This made Petitioner "jealous" and he "tried to grab the phone from her, and she snatched back."  (*Id.* at 91.)  Petitioner acknowledged "fault that the phone did hit her."  (*Id.*)  "And, yeah, sure enough, after that, I did -- I did strike her. . . . I slapped her with my hand [one time]."  (*Id.* at 92.)  Soon thereafter, a police vehicle arrived.

Officer Ryan Allen of the Ecorse Police Department arrived at the scene and spoke with Tompkins while another officer stayed outside with Petitioner.  (*Id.* at 68.)  According to Officer Allen, Plaintiff appeared scared, was shaking, her right eye was swollen, and she had a small laceration on her lip.  (*Id.* at 66-67.)  Tompkins did not mention her neighbor during their conversation, so the police officers did not contact her for any information.  (*Id.* at 69-70.)   Although the transcript is not abundantly clear in this regard, it appears that the police officers were not informed of "Jackie" – the woman who was in Petitioner's vehicle upon his arrival.  Tompkins testified that she had the vehicle towed from her house "[b]ecause the lady that he had in the car got up and walked away." [6]  (*Id.* at 62.)

The following day, Sergeant Narda Bruno, the lead detective on the case, called Tompkins to come in, provide a written statement, and take a photograph.

_____

[6] Petitioner was unable to move the vehicle, as he was placed under arrest and taken into custody.

6

(*Id.* at 72.)  Sergeant Bruno observed bruising on Tompkins's right eye.  (*Id.* at 73.)

The photograph of Tompkins was subsequently misplaced.  (*Id.* at 74.)  On cross-

examination, Sergeant Bruno stated that during her interview with Tompkins,

Tompkins indicated that that Petitioner had been stalking her, threatening her, and

threatened to burn her home down since she had returned to Michigan from

Alabama to care for her ailing mother.  (*Id.* at 75-76.)  As with Officer Allen,

Sergeant Bruno was not aware that Tompkins's neighbor was outside when the

incident got underway.  (*Id.* at 76.)

　　　After closing arguments, the trial court, acting as fact-finder, mostly credited

Tompkins's version of events, finding Petitioner guilty beyond a reasonable doubt of

the home invasion and felonious assault charges.  (*Id.* at 118 (describing portions of

Petitioner's trial testimony as "[t]he most ridiculous thing I ever heard[]"); *id.* at 119

(summarizing Petitioner's account of how Tompkins was hit with the telephone

before indicating that "I don't believe it for a second").)  However, the trial judge

concluded that the existence of a dating relationship could not be proven beyond a

reasonable doubt, and therefore found Petitioner not guilty of the domestic violence

offense.  (*Id.* at 120.)

　　　Petitioner returned to court on January 21, 2011 for sentencing.  Petitioner

was sentenced as a fourth-habitual offender, Michigan Compiled Laws § 769.12, to

concurrent terms of eight years and five months to twenty years for the home-

invasion conviction, and eight years and five months to fifteen years for the felonious-assault conviction.[7]

Subsequently, Petitioner filed an appeal with the Michigan Court of Appeals, presenting each of the claims raised in the instant habeas petition to the state appellate court.  The court affirmed his convictions and sentence on direct appeal. *People v. Jackson,* No. 304474, 2012 WL 3021448, at *1 (Mich. Ct. App. July 24, 2012) (unpublished) (per curiam).  Petitioner then sought leave to appeal with the Michigan Supreme Court, which was denied.  *People v. Jackson*, 823 N.W.2d 583 (Mich. 2012) (table).

## II.    STANDARD OF REVIEW

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub. L. No. 104-132, 110 Stat. 1214.  In order to grant relief, this Court must conclude that the state court's decision "with respect to any claim that was adjudicated on the merits in State court proceedings" was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[]" or (2) "based on an

---

[7] These sentences are consecutive to his prior sentences, Michigan Compiled Laws § 768.7a, since Petitioner was on parole when the crimes were committed. The Court notes that there appears to be some discrepancy with regard to whether Petitioner was sentenced as a third- or fourth-habitual offender.  (Resp't's Br. 4 n.2.) For purposes of the present dispute, the discrepancy is immaterial.

unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The Supreme Court has expounded upon the meanings of the two clauses contained in 28 U.S.C. § 2254(d)(1).  *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000) (O'Connor, J., opinion of the Court for Part II) ("[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."). "A state-court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent."  *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009) (alterations in original) (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 405, 120 S. Ct. at 1519).

Alternatively, "[i]f the state court identifies the correct governing legal principle . . . , habeas relief is available under the unreasonable application clause if the state court unreasonably applies that principle to the facts of the prisoner's case or unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context."  *Akins v. Easterling*, 648 F.3d 380, 385 (6th Cir. 2011) (internal quotation marks and alterations omitted).  A federal court may not find a state court's application of Supreme Court precedent unreasonable if

9

it is merely "incorrect or erroneous.  [Rather, t]he state court's application must have

been 'objectively unreasonable.'"  *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 520-21,

123 S. Ct. 2527, 2535 (2003) (citations omitted).

Factual determinations made by state court judges in the adjudication of

claims cognizable on habeas review are accorded a presumption of correctness.  28

U.S.C. § 2254(e)(1).  A habeas petitioner may rebut this presumption only with clear

and convincing evidence.  *Id.*  Moreover, habeas review of claims adjudicated on the

merits is "limited to the record that was before the state court."  *Cullen v. Pinholster*,

563 U.S. __, 131 S. Ct. 1388, 1398 (2011).

## III.   ANALYSIS

### A.   Sufficiency of the Evidence

In his first claim, Petitioner contends that there was insufficient evidence

presented at trial to support the trial court's verdict.  Specifically, he asserts that the

victim's testimony was not credible, and that no rational fact-finder could have

therefore found him guilty.  The state appellate court disagreed, upholding

Petitioner's convictions on direct appeal.  The Michigan Court of Appeals explained:

> There was sufficient evidence for a rational trier of fact to find
> that the essential elements of first-degree home invasion were proven
> beyond a reasonable doubt.  The victim testified that defendant did not
> have permission to enter the house and that he pushed his way into her
> house.  After defendant entered the victim's house, he hit her in the
> face with a cordless phone.  Given this evidence, a rational trier of
> fact could find that the elements of first-degree home invasion were
> proven beyond a reasonable doubt.

10

> There was also sufficient evidence for a rational trier of fact to find that the essential elements of felonious assault were proven beyond a reasonable doubt. The victim testified that defendant forcibly pushed his way into her house. Defendant testified that he felt disrespected and jealous. Defendant twice hit the victim in the face with a cordless phone, resulting in a bruise beneath her eye. Given this evidence, a rational trier of fact could find that the elements of felonious assault were proven beyond a reasonable doubt

*Jackson*, No. 304474, 2012 WL 3021448, at *1. This determination is in accord with Supreme Court precedent and is objectively reasonable, thereby precluding habeas relief.

**1.    *Governing Law***

It is axiomatic that the Due Process Clause of the Fourteenth Amendment to the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970). Pursuant to Supreme Court precedent, evidence adduced at trial is sufficient to support a conviction whenever, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16, 99 S. Ct. at 2792 n.16. "*Jackson* leaves [fact-finders] broad

11

discretion in deciding what inferences to draw from the evidence presented at trial . . . . This deferential standard does not permit . . . fine-grained factual parsing." *Coleman v. Johnson*, __ U.S. __, 132 S. Ct. 2060, 2064 (2012) (citations and internal quotation marks omitted).  Indeed, "[i]t is the province of the fact-finder to weigh the probative value of the evidence and resolve any conflicts in testimony[,]" not that of a reviewing court.  *Matthews v. Abramajtys*, 319 F.3d 780, 788-89 (6th Cir. 2003).

Because Petitioner's sufficiency of the evidence challenge was adjudicated on the merits by the Michigan Court of Appeals, this Court must view the state court's determination through the lens of 28 U.S.C. § 2254(d)(1).  As framed by AEDPA, the issue is whether the Michigan Court of Appeals unreasonably applied *Jackson* to the facts of Petitioner's case.  "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was "objectively unreasonable."'"  *Parker v. Matthews*, __ U.S. __, 132 S. Ct. 2148, 2152 (2012) (quoting *Cavazos v. Smith*, 565 U.S. 1, __, 132 S. Ct. 2, 3 (2011) (per curiam)).  This standard "commands deference at two levels . . . first, to the [fact-finder's] verdict as contemplated by *Jackson*, and, second, to the state court's consideration of the [fact-finder's] verdict as dictated by AEDPA."  *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007); *see also McGuire v. Ohio*, 619 F.3d 623,

12

631 (6th Cir. 2010) ("Two layers of deference apply to habeas claims challenging evidentiary sufficiency.") (citation omitted).

## 2.   *Application*

Petitioner's sufficiency challenge involves two distinct components.  In the first, Petitioner contends that no rational trier of fact could credit Tompkins's testimony given the inconsistencies between her preliminary examination testimony and her testimony at trial.  For instance, Petitioner notes that Tompkins testified inconsistently about where she was hit and how many times.[8]  He also notes that Tompkins testified that she recognized Petitioner's car, which he claims proves that the two had become reacquainted, despite her assertions to the contrary.  In his second line of argumentation, Petitioner argues that a cordless phone does not constitute a "dangerous weapon" as required by state law to support the charges of first-degree home invasion and felonious assault.[9]

---

[8] *See* note 3, *supra*.

[9] As set forth in the Michigan Court of Appeals' decision,

A person commits first-degree home invasion if: (1) he breaks and enters a dwelling or he enters a dwelling without permission; (2) he intends when entering to commit a felony, larceny, or assault in the dwelling or at any time while entering, present in, or exiting the dwelling he commits a felony, larceny, or assault; and (3) while he is entering, present in, or exiting the dwelling, he is armed with a dangerous weapon or another person is lawfully present in the dwelling. MCL 750.110a; *People v. Baker,* 288 Mich.App 378, 384; 792 NW2d 420 (2010). The elements of felonious assault are: (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the

With respect to his first set of challenges, Petitioner rather forthrightly acknowledges that "this matter was a pure credibility contest." (Pet'r's Br. 11.) However, "attacks on witness credibility are simply challenges to the quality of the [prosecution's] evidence and not to the sufficiency of the evidence." *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002) (citation omitted). Even though there were inconsistencies in Tompkins's testimony, "[i]t is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony." *Matthews*, 319 F.3d at 788 (citation omitted). "A reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 132, 130 S. Ct. 665, 673 (2010) (quotation omitted). In the instant case, the record is clear that the trial judge credited Tompkins's version of what transpired. This Court, sitting in habeas corpus, will not, and indeed may not, second-guess the trial judge's credibility determination.

In light of the evidence adduced at trial, the Michigan Court of Appeals' determination that the evidence was sufficient to support Petitioner's convictions

---

victim in reasonable apprehension of an immediate battery. MCL 750.82; *People v. Chambers,* 277 Mich.App 1, 8; 742 NW2d 610 (2007).

*Jackson*, No. 304474, 2012 WL 3021448, at *1.

14

was not an objectively unreasonable application of *Jackson*.  The state appellate

court properly examined the evidence in the light most favorable to the prosecution,

deferred to the fact-finder's credibility findings, and determined that a rational fact-

finder could draw the reasonable inference that Petitioner was guilty as charged.

With respect to the remaining "sufficiency" challenge regarding the telephone

as a deadly weapon, the Michigan Court of Appeals explained:

> Defendant also claims that there was insufficient evidence to convict him of first-degree home invasion and felonious assault because a cordless phone is not a dangerous weapon. The home invasion statute defines a dangerous weapon, in part, as
>
>> (iii) An object that is likely to cause death or bodily injury when used as a weapon and that is used as a weapon or carried or possessed for use as a weapon. [Mich. Comp. Laws § 750.110a(1)(b).]
>
> The felonious assault statute does not define dangerous weapon, but case law suggests that the analysis is the same as under the home invasion statute. Our Supreme Court has noted that a telephone can be used as a dangerous weapon.  *People v. Heflin*, 434 Mich. 482, 508 n.19 (1990); see also *People v. Goolsby*, 284 Mich. 375, 378 (1938) (An item can be a dangerous weapon . . . if it "was used as a weapon and, when so employed in an assault, dangerous"). Evidence was presented  that defendant assaulted the victim by using a cordless telephone to strike her in the face causing bodily injury, thereby establishing that the telephone was used as a deadly weapon.

*Jackson*, No. 304474, 2012 WL 3021448, at *2.

A federal court on habeas review must distinguish pure sufficiency of the evidence claims from state law claims disguised as *Jackson* claims. The Sixth Circuit has provided guidance in this regard:

> There is a tension inherent in sufficiency of the evidence claims where the underlying conviction is a violation of state law. Generally speaking, federal habeas corpus is not the proper vehicle for state prisoners to seek review of issues of state law. State courts, after all "are the final arbiters of the [state] law's meaning and application" and this Court is not the appropriate forum to adjudicate such issues. *Summers v. Leis*, 368 F.3d 881, 892 (6th Cir. 2004) (alteration added). . . . Thus, while the Supreme Court has instructed us to conduct our habeas review "with explicit reference to the substantive elements of the criminal offense as defined by the state law," our role is not to reanalyze the state court's interpretation of state law. *Jackson*, 443 U.S. at 324, n.16. Rather, our review in such cases is limited to determining whether the evidence was so overwhelmingly in favor of the petitioner that it compelled a verdict in his or her favor.

*Thompson v. Bock*, 215 F. App'x 431, 436 (6th Cir. 2007).

Under the foregoing authority, Petitioner's assertions that the state court improperly interpreted or construed the language of the home invasion and felonious assault statutes with regard to what constitutes a dangerous weapon amounts to an invitation that this Court "reanalyze the state court's interpretation of state law." *Id.* (citation omitted). The Court must decline such an invitation, as this is not the proper forum to determine the proper meaning and application of state statutory law.

According the state court's findings of fact a presumption of correctness, this Court concludes that the Michigan Court of Appeals' decision that sufficient

16

evidence was presented to sustain Petitioner's conviction did not "result[] in a decision that . . . involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Petitioner is therefore not entitled to habeas relief on this claim.

## B.   Ineffective Assistance of Counsel

In his second claim for relief, Petitioner argues that his trial counsel was ineffective for failing to call four witnesses: Jackie, Tompkins's neighbor, and Louis Whittaker – each of whom he claims witnessed Petitioner helping Tompkins with the garbage and enter her house without incident – and Nathan.[10] According to Petitioner, these witnesses would have either bolstered his position that he had permission to enter Tompkins's residence or provided support to his position that he and Tompkins had an ongoing relationship.

The Michigan Court of Appeals rejected this claim, reasoning as follows:

> Defendant asserts that defense counsel was ineffective because he failed to call Louis Whittaker III at trial. At trial, defendant testified that he had a woman named Jackie with him in his car when he went to the victim's house. On appeal, he argues that Whittaker was also in the car, and that his trial counsel should have called Whittaker as a witness. To support his argument, defendant has provided a non-notarized written statement from Whittaker. Review of a claim of ineffective assistance of counsel, however, is limited to the record. *People v. Jackson*, 292 Mich. App. 583, 600 (2011). Whittaker's statement is not part of the lower court record and cannot be considered on appeal. Furthermore, defendant never mentioned Whittaker in his testimony at trial, and, therefore, there is nothing in

---

[10] *See* note 5, *supra*.

17

the lower court record to show what Whitaker's testimony would
have been, or that defendant's trial counsel knew, or should have
known, to investigate or call Whittaker as a witness. Therefore, there
is nothing in the record to suggest that the performance of
defendant's trial counsel fell below an objective standard of
reasonableness.

Defendant also asserts that defense counsel was ineffective
because he failed to investigate or call two other eye witnesses and
one impeachment witness. However, defendant offers no evidence to
show what the proposed witnesses would have testified to or that the
proposed witnesses would have testified on defendant's behalf.
Therefore, there is no evidence to prove that his trial counsel
performed below an objective standard of reasonableness, or that the
outcome of trial would have been different had these witnesses
testified.

*Jackson*, No. 304474, 2012 WL 3021448, at *2-3. The Court is unable to conclude

that this decision is either contrary to federal law or involved an objectively

unreasonable application of the law governing ineffective assistance of counsel

claims.

## 1.     *Governing Law*

The Sixth Amendment to the United States Constitution guarantees criminal

defendants "the right to the effective assistance of counsel[,]" *Strickland v.*

*Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063 (1984) (citation and internal

quotation marks omitted), not the flawless assistance of counsel, *Smith v. Mitchell*,

348 F.3d 177, 206 (6th Cir. 2003) ("After all, the constitutional right at issue here is

ultimately the right to a fair trial, not to perfect representation."). To show that he

18

was denied the effective assistance of counsel under federal constitutional standards,

Petitioner must satisfy *Strickland*'s two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687, 104 S. Ct at 2064.

When confronted with a case containing the procedural posture presented here – a federal district court reviewing an ineffective assistance of counsel claim adjudicated on the merits and denied by a state court by way of federal habeas review – courts must not conflate the "highly deferential" standards independently created by *Strickland* and § 2254(d). *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770, 788 (2011); *id.* at 785 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard."). Instead, "when the two [standards] apply in tandem," a federal district court must apply a "doubly" deferential standard. *Id.* at 788 (citation omitted). Thus, the Court's task today is not to consider *ab initio* whether Petitioner's counsel satisfied the requirements of *Strickland*; rather, the Court must decide whether the state

court's *Strickland* determination was "contrary to, or involved an unreasonable application of, clearly established Federal law[.]"  28 U.S.C. § 2254(d)(1).

## 2.   *Application*

Petitioner contends that his trial counsel performed deficiently by failing to investigate and call witnesses at trial.  The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 2588 (1986) (quotation omitted).  It is well-established that the Sixth Amendment imposes on counsel "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary[,]" *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066, which includes an obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence, *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).

Because ineffective assistance is equated with "representation f[alling] below an objective standard of reasonableness[,]" "[i]n any ineffectiveness case, a particular decision to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 688, 691, 104 S. Ct. at 2064, 2066.  This requires courts to accord counsel's strategic or tactical decisions regarding case presentation great deference.  However, the mere labeling of a decision as strategic does not preclude

20

judicial review.  The touchstone is "not [only] whether counsel's choices were strategic, but whether they were reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 1037 (2000).  The Sixth Circuit has rejected the notion that a "'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."  *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)).

In rejecting Petitioner's claim regarding Whittaker, the Michigan Court of Appeals noted that Petitioner failed to mention Whittaker's presence during his trial testimony. [11]  The court further noted that Whittaker's written statement was not part of the lower court record, thereby precluding the court from determining whether trial counsel knew, or should have known, about Whittaker's alleged presence in the vehicle on the night in question.  As a result, the court could not conclude that counsel performed deficiently.  In deciding Petitioner's other failure-to-investigate claims, the Michigan Court of Appeals held that because of the absence of an adequate proffer of how the uncalled witnesses would have testified, Petitioner could not demonstrate deficient performance or prejudice.

---

[11] Whittaker's written, but non-notarized, statement is dated October 18, 2010, approximately two months before the date of Petitioner's December 2010 trial. However, the written statement does not appear in the record until December 2011, when it was attached as an appendix to Petitioner's brief on direct appeal.  (ECF No. 10-5, Pg ID 313.)

The Court does not find anything about these determinations unreasonable, as neither Petitioner nor his appellate counsel endeavored to identify Tompkins's neighbor by name or to get a statement from Jackie.  While it is true that Petitioner sought an evidentiary hearing in the state courts to develop factual support for his claim, the motion was denied by summary order.  This ruling does not allow the Court to hold an evidentiary hearing of its own.  Rather, the Court is bound by the record before the state appellate court.  *Pinholster*, 131 S. Ct. at 1398.

The record before the state appellate court amply supports its rejection of Petitioner's ineffective assistance claim.  The first time Petitioner mentioned the presence of a third individual in the vehicle (other than himself and Jackie) was during his colloquy with the trial judge at sentencing.  (1/21/11 Sent'g Tr. 18, ECF No. 10-4.)  Whittaker was not identified by name; however, Petitioner stated that, in addition to having a lady in the car when he arrived at Tompkins's residence, he also "had my cousin in the back seat[.]"  (*Id.*)  The trial judge responded: "You didn't tell us that during the trial.  You talked about the older lady. . . .  You talked about the lady."  (*Id.*)  Curiously, Petitioner stated: "No, you talked about her, saying she was seventy-some years old.  I didn't [] say how old she was.  You said that. . . .  I didn't [] say she was seventy-some years old."  (*Id.* at 18-19.)  During the trial, however, Petitioner testified as follows: "I picked up Jackie . . . [s]he's an old elderly lady. . . . And she something like close to seventy."  (12/16/10 Trial Tr. 88.)

22

Further, the value of Whittaker's written statement is questionable, at best. For instance, Whittaker indicates that he was in Petitioner's car, but makes no mention of Jackie, who Petitioner repeatedly placed in his vehicle on the night in question during his trial testimony. (Statement, ECF No. 10-5, Pg ID 313.) Petitioner, who, it bears emphasizing, testified in his defense at trial, indicated he picked Jackie up from the store, drove to Tompkins's house, and spoke with Jackie about the lights in Tompkins's residence after the vehicle pulled into the driveway. (12/16/10 Trial Tr. 88, 99.)  During cross-examination, Petitioner explained that had things gone differently that night, he might have spent the night at Tompkins's house.  (*Id.* at 105.)  The prosecutor inquired as to whether that meant Jackie would be sleeping in Petitioner's vehicle, and Petitioner explained that he would have dropped Jackie off first.  (*Id.* at 105-06.)   There is no indication, based on Petitioner's testimony, that counsel was unreasonable for failing to present Whittaker's testimony, assuming he was aware of Whittaker's existence.  This is particularly true since Whittaker's testimony, as explained above, would have materially differed from Petitioner's, which would have called Petitioner's credibility into question.

With respect to Jackie, Tompkins's neighbor, and Nathan, the Court concludes that the Michigan Court of Appeals was reasonable for determining that Petitioner's failure to provide any indication of how they would have testified

precludes an ineffective assistance claim.  Mere conjecture and speculation simply do not suffice at this juncture.  Without factual support to demonstrate that Petitioner's trial counsel was ineffective, the Court cannot conclude that any allegedly deficient performance in failing to investigate or call certain witnesses prejudiced Petitioner at trial.  Petitioner's claim must therefore be denied.

## C.    Sentencing Claims

Petitioner's final claim asserts that his sentence is invalid because the trial court exceeded sentencing guidelines without providing substantial and compelling reasons for the upward departure. Like the Michigan Court of Appeals, this Court finds no merit to Petitioner's claim.

A state court's interpretation and application of state sentencing laws and guidelines is a matter of state concern only, *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003), and "[a] federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41, 104 S. Ct. 871, 875 (1984).  Federal courts must "defer to a state's judgment on issues of state law" and "accept a state court's interpretation of its statutes." *Israfil v. Russell*, 276 F.3d 768, 771-72 (6th Cir. 2001).  Consequently, the contention that the trial court miscalculated the state sentencing guidelines is not cognizable on federal habeas corpus review. *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007);

24

*McPhail v. Renico*, 412 F. Supp. 2d 647, 656 (E.D. Mich. 2006); *Robinson v. Stegall*, 157 F. Supp. 2d 802, 823 (E.D. Mich. 2001).

## IV.   CERTIFICATE OF APPEALABILITY

Petitioner may not appeal the Court's denial of his habeas petition unless a district or circuit judge issues a certificate of appealability.  28 U.S.C. § 2253(c)(1)(A).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 1034 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000)).  Where, as here, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484, 120 S. Ct. at 1604.

Reasonable jurists would not debate the Court's assessment of Petitioner's claims, nor conclude that the issues deserve encouragement to proceed further.  The Court therefore declines to issue a certificate of appealability.  Petitioner

nevertheless may proceed *in forma pauperis* on appeal because he was granted leave to proceed *in forma pauperis* in this Court, (ECF No. 2), and an appeal could be taken in good faith.  Fed. R. App. P. 24(a)(3)(A).

## V.  CONCLUSION AND ORDER

For all the reasons stated herein, the state court's rejection of Petitioner's claims was objectively reasonable.  Petitioner is therefore not entitled to the issuance of the writ of habeas corpus.

Accordingly,

**IT IS ORDERED** that the Clerk of the Court shall amend the case caption to reflect that Duncan MacLaren is the proper respondent;

**IT IS FURTHER ORDERED** that the petition for writ of habeas corpus (ECF No. 1) is **DENIED** and a certificate of appealability **SHALL NOT** issue.

Dated: January 29, 2015

                                        s/Patrick J. Duggan
                                        PATRICK J. DUGGAN
                                        UNITED STATES DISTRICT JUDGE

Copies to:

**Don Jackson**, 168403
Kinross Correctional Facility
16770 S. Watertower Drive
Kincheloe, MI 49788

**Elizabeth M. Rivard, AAG**
**Laura Moody, AAG**